UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KIRK RAMEY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 25-cv-11904-ADB |
| | * | |
| BETA BIONICS, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

# **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

　　Plaintiff Kirk Ramey ("Ramey") brings this action for breach of contract and violation of Mass. Gen. Laws ch. 93A against Defendant Beta Bionics, Inc. ("Beta Bionics"), based on a share lockup that allegedly prevented him from selling his shares in Beta Bionics following Beta Bionics' initial public offering ("IPO"). [ECF No. 1-1 ("Complaint" or "Compl.")]. Before the Court is Beta Bionics' motion to dismiss for failure to state a claim. [ECF No. 9]. For the following reasons, Beta Bionics' motion is **GRANTED**.

I.      BACKGROUND

      A.      Factual Background

For purposes of this motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir. 2020)).

Ramey is an inventor who helped develop a bionic pancreas. [Compl. ¶ 3]. In 2018, he sued Boston University, Beta Bionics—a company established to commercialize the bionic pancreas—and others in Massachusetts state court, seeking to recover an equity stake in Beta Bionics that he had allegedly been promised. [Id.]; see generally Ramey v. Beta Bionics, Inc., Civil Action No. 1884CV03240 (Mass. Super. Ct. filed Oct. 18, 2018). That lawsuit was settled on April 2, 2024, in a settlement agreement governed by Massachusetts law. [Compl. ¶¶ 4, 32]; see also [ECF No. 31 (settlement agreement)].

As relevant here, Section 5 of the settlement agreement provided for the transfer of 100,000 shares of Class B Common Stock of Beta Bionics from Edward Damiano, Beta Bionics' President and CEO, to Ramey. [Compl. ¶ 5]; Complaint ¶ 5, Ramey v. Beta Bionics, Inc., Civil Action No. 1884CV03240 (Mass. Super. Ct. Oct. 18, 2018). Section 5 further provided that

> Beta Bionics and Damiano represent and warrant that there are no adverse claims to the shares that will be transferred to Ramey, and Damiano and Beta Bionics agree that Ramey shall have the status of a purchaser for value and that he will acquire the shares free of any adverse claim. Beta Bionic shall promptly register the transfer of shares to [Ramey.] Ramey's shares shall have the same rights and restrictions as all other Class B Common Stock and shall be treated identically with all other Class B Common Stock for all purposes.

[Compl. ¶ 5 (emphasis omitted)]. Under Beta Bionics' articles of organization, there were no transfer restrictions on Class B Common Stock, [id. ¶ 6], and no transfer restrictions were stated on Ramey's stock certificate, [id. ¶ 7].

After Ramey received the stock, [Compl. ¶ 7], he was "anxious to sell [it] as quickly as possible given his skepticism about Beta [Bionics'] likely long-term success," [id. ¶ 8].[1] On December 9, 2024, he wrote to Beta Bionics, telling them that he wanted to sell his stock and confirming that there were no restrictions on its transfer. [Id. ¶ 9]. In response, Beta Bionics acknowledged the absence of transfer restrictions and told Ramey that, if he wanted to sell his shares, "he [would] need to find a buyer on his own." [Id. ¶ 10].

Thereafter, on January 6, 2025, Beta Bionics wrote to its stockholders, including Ramey, noting that its underwriters were requiring that all stockholders sign a lock-up agreement, which would prevent stockholders from selling or transferring stock from the date of the agreement until 180 days after the date of the pricing of Beta Bionics' impending IPO, and requesting that they sign the lock-up agreement "as soon as possible." [Compl. ¶ 11]. Ramey refused to sign the agreement, and claims that, consequently, he "maintained the right to sell his stock." [Id. ¶ 12].

Beta Bionics went public on January 31, 2025. [Comp. ¶¶ 13, 16]. By then, Ramey had hired a financial advisor to help him liquidate his stock, but Beta Bionics' employees

---

[1] With the benefit of hindsight, the Court notes that this concern has thus far not proved well-founded. Beta Bionics' stock closed at $23.81 on January 31, 2025. [Compl. ¶ 24]. In June 2025, when Ramey initiated the instant action, it was trading at approximately $11, [id.], but the stock price recovered following the expiry of the six-month post-IPO lock-up period, see [ECF No. 28 at 3 n.2], and it is currently trading at approximately $31, see Beta Bionics, Inc. Common Stock (BBNX) Historical Quotes, Nasdaq, https://www.nasdaq.com/market-activity/stocks/bbnx/historical.

3

"intentionally stalled and ultimately refused to cooperate" with the advisor.  [Id. ¶¶ 13–14].  Specifically, Beta Bionics, which had recently switched from one stock transfer agent, Shareworks, to another, Computershare,[2] see [id. ¶¶ 16–18], "deliberately failed to include Ramey's interests when transferring its share records to Computershare," [id. ¶ 16], which prevented Ramey from selling his stock, [id. ¶ 17].  When Ramey tried to resolve this issue with Beta Bionics, Beta Bionics "stated for the first time" that his shares were "locked up for 180 days post-IPO due to the market standoff provision tied to the shares received by Ramey from Damiano."  [Id. ¶ 18].  Ramey contends that Beta Bionics generated this "restriction myth simply to garner a benefit to which it was not entitled – the stolen right to protect the enterprise value of the company by preventing Ramey from selling."  [Id. ¶ 23].

### B.     Procedural Background

On June 3, 2025, Ramey initiated the instant action in Massachusetts Superior Court.  [ECF No. 1-1].  On July 3, 2025, Beta Bionics timely removed to federal court based on diversity jurisdiction.  [ECF No. 1].  Ramey filed a motion to remand to state court on August 4, 2025, [ECF No. 12], which this Court denied on September 9, 2025, [ECF No. 21].

On July 25, 2025, Beta Bionics filed a motion to dismiss for failure to state a claim.  [ECF No. 9].  Briefing on the motion was stayed pending the resolution of Ramey's motion to remand, see [ECF No. 19], but, after the Court denied that motion, Ramey opposed Beta Bionics' motion to dismiss, [ECF No. 25], and Beta Bionics replied, [ECF No. 28].

---

[2] "Transfer agents record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends."  Transfer Agents, SEC, https://www.sec.gov/about/divisions-offices/division-trading-markets/transfer-agents.

## II.  LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citation modified) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).

The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.  "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).

## III.  DISCUSSION

The Complaint asserts two causes of action against Beta Bionics based on its alleged breach of the settlement agreement, one for breach of contract (Count I) and one under Mass. Gen. Laws ch. 93A (Count II).  [Compl. ¶¶ 26–34].

### A.  Breach of Contract

Ramey claims that Beta Bionics breached the settlement agreement because the transfer restrictions on his stock during the post-IPO lock-up period constituted an "adverse claim" and

his stock was not treated identically with other Class B Common stock. [Compl. ¶¶ 20–21]; [ECF No. 25 at 8–11]. Beta Bionics argues that Ramey has not plausibly alleged that it breached the settlement agreement. [ECF No. 10 at 4–8].

The Court applies Massachusetts law in accordance with the settlement agreement's choice-of-law provision. [ECF No. 31 at 5]; see also Patton v. Johnson, 915 F.3d 827, 837 (1st Cir. 2019) ("[W]hen the parties agree on the substantive law that should govern, 'we may hold the parties to their plausible choice of law.'" (quoting Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011))). "In order to state a viable breach of contract claim under Massachusetts law, plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007). The parties do not dispute that a valid, binding contract existed but rather focus primarily on whether Ramey has plausibly alleged a breach of that contract.[3] Accordingly, for Ramey's claim to survive dismissal, it must be plausible to read the contract in his favor and the complaint's allegations must indicate that Beta Bionics breached the contract. See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 235 (1st Cir. 2013).

---

[3] In a footnote in its reply, Beta Bionics suggests that, because of the recovery of Beta Bionics' share price, Ramey "does not—and cannot—articulate how" he was damaged, and that his breach-of-contract claim should be dismissed for failure to mitigate damages. [ECF No. 28 at 3 n.2]. To the extent Beta Bionics has not waived this argument, see, e.g., WNAC, LLC v. Verizon Corp. Servs. Grp., Inc., No. 21-cv-10750, 2024 WL 778794, at *7 (D. Mass. Feb. 26, 2024), the Court rejects it. Ramey plausibly alleges that his inability to sell his stock before the company went public caused him to lose a potential profit, [Compl. ¶ 24], and whether his efforts to sell his stock were or have been adequate involves fact issues not suitable for resolution on a motion to dismiss. See, e.g., Tang Cap. Partners, LP. v. BRC Inc., 661 F. Supp. 3d 48, 75–76 (S.D.N.Y. 2023) (rejecting similar arguments on motion to dismiss breach-of-contract claim based on company's refusal to permit investor to exercise warrants to purchase shares).

In interpreting a contract, the Court "must first assess whether the contract is ambiguous," which is a "question of law." Sonoiki v. Harvard Univ., 37 F.4th 691, 703 (1st Cir. 2022). A contract is not ambiguous merely because the litigants disagree about its meaning. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011). "Rather, 'a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" Id. (quoting Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998)); see also Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013) ("Language is only ambiguous 'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" (quoting Lass v. Bank of Am., N.A., 695 F.3d 129, 134 (1st Cir. 2012))). "The meaning of an unambiguous contract term is a question of law," and, "[s]hould the court find the contract language unambiguous," the Court must "interpret it according to its plain terms." Farmers Ins. Exch., 632 F.3d at 783; see also Barclays Bank PLC, 710 F.3d at 21 ("[W]e construe all words according to 'their usual and ordinary sense.'" (quoting Gen. Convention of New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007))). The meaning of an ambiguous contract term, by contrast, is "normally . . . a matter for the factfinder." Farmers Ins. Exch., 632 F.3d at 783 (quoting Bank, 145 F.3d at 424).

Here, neither of Ramey's theories of breach is plausible. Ramey's first theory is that the post-lockup transfer restrictions imposed by Beta Bionics on his stock were an "adverse claim," and that Beta Bionics breached its promise, contained in Section 5 of the settlement agreement, that he would "acquire the shares free of any adverse claim." [ECF No. 25 at 8–10]. The problem with this theory is that the term "adverse claim" cannot plausibly be read as Ramey

proposes.  As an initial matter, under the plain terms of the agreement, Beta Bionics promised only that the stock was "free of adverse claims" at the time Ramey acquired it.  [Compl. ¶ 5 ("Beta Bionics and Damiano represent and warrant that there <u>are</u> no adverse claims to the shares that will be transferred to Ramey, and Damiano and Beta Bionics agree that Ramey shall have the status of a purchaser for value and that he <u>will acquire</u> the shares <u>free of any adverse claim</u>. (emphasis added))].  Ramey acquired the stock before Beta Bionics went public (and before it sent its stockholders the lock-up agreement), [<u>id.</u> ¶¶ 7, 11–13], and Ramey has not alleged that his stock was subject to any transfer restriction at the time of transfer, [<u>id.</u> ¶ 20].  Thus, it is implausible to suggest that Beta Bionics' assertion of temporary transfer restrictions after the transfer to Ramey and after the IPO amounted to an "adverse claim" in violation of the settlement agreement.

  Even assuming that the temporary post-IPO transfer restrictions could somehow be read as burdening Ramey's shares at the time he received them, it is implausible to interpret the phrase "adverse claim" as encompassing such restrictions.  Under Massachusetts law, an adverse claim in this context is "a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset."  Mass. Gen. Laws ch. 106, § 8-102(1); <u>see also</u> <u>Demoulas v. Demoulas</u>, 732 N.E.2d 875, 888 (Mass. 2000) (quoting prior version of statute that defined "adverse claim" as "a claim that a transfer was or would be unauthorized or wrongful or that a particular adverse person is the owner of or has an interest in the security" (quoting Mass. Gen. Laws ch. 106, § 8–

8

302(2)(1957) (amended 1997))).[4]  Because this definition "explicitly limits the term adverse claim to property interests," a simple breach of contract, which does not give rise to a property interest, does not constitute an "adverse claim."  U.C.C. § 8-102, cmt. 1 (A.L.I. & Unif. L. Comm'n 2022).[5]  Here, based on the allegations in the Complaint, Ramey acquired ownership of the stock through the settlement agreement.  Even assuming that Beta Bionics retained a right to impose temporary transfer restrictions on that stock in the future, such a right would not constitute an "adverse claim" as to Ramey's stock because it would not result in Beta Bionics retaining any property interest in the stock that would have been violated by Ramey's transfer of the stock.  Thus, Ramey has not plausibly alleged that Beta Bionics' post-IPO lock-up of his shares violated its promise that the shares would be delivered free of any adverse claim.

     Ramey's arguments to the contrary are unpersuasive.  He contends that the Court should interpret the term "adverse claim" in accordance with a Treasury regulation, 26 C.F.R. § 1.451-2, that governs the constructive receipt of income and provides that "income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." [ECF No. 25 at 8–9].  He also says, alternatively, that the parties' differing

---

[4] The parties do not address whether the Uniform Commercial Code, as adopted by the Massachusetts legislature, applies to the settlement agreement, see Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co., 520 N.E.2d 1321, 1324 (Mass. App. Ct. 1988), but, in the absence of a definitive statement of the Massachusetts Supreme Judicial Court on the meaning of "adverse claim," the Court consults the statutory definition of "adverse claim," as well as analogous case law, Michelin Tires (Canada) Ltd. v. First Nat. Bank of Bos., 666 F.2d 673, 682 (1st Cir. 1981); see also i.Lan Sys., Inc. v. Netscout Serv. Level Corp., 183 F. Supp. 2d 328, 332 (D. Mass. 2002) (consulting Uniform Commercial Code, even though it "very likely" did not govern agreement at issue because it "best fulfills the parties' reasonable expectations").
[5] The Official Commentary to the Code "was not enacted into law by Massachusetts," but the Supreme Judicial Court of Massachusetts "routinely treat[s it] . . . as highly persuasive authority."  Pride Hyundai, Inc. v. Chrysler Fin. Co., 369 F.3d 603, 613–14 (1st Cir. 2004).

interpretations of the term show that its meaning is ambiguous and must be "ferreted out during discovery." [Id. at 9]. But the Treasury regulation nowhere mentions the term "adverse claim," and Ramey offers no cogent reason why the plain language of the agreement should be interpreted by reference to it. Thus, Ramey's attempt to create ambiguity fails because he has not shown that the term is "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Barclays Bank PLC, 710 F.3d at 21 (quoting Lass, 695 F.3d at 134). Moreover, because the term "adverse claim" is unambiguous, its proper interpretation is a question of law for the Court that does not require discovery. Farmers Ins. Exch., 632 F.3d at 783.

Ramey's second theory of breach is that Beta Bionics' unilateral imposition of the lock-up on Ramey violated Beta Bionics' promise that Ramey's shares would have "the same rights and restrictions as all other Class B Common Stock" and would be "be treated identically with all other Class B Common [S]tock for all purposes" because other shareholders agreed to sign the lock-up agreement, but Ramey did not. [ECF No. 25 at 10–11]. This theory suffers from a more fundamental flaw than the first: the Complaint nowhere alleges that other shareholders were treated differently than Ramey. Specifically, the Complaint does not allege that any other shareholders were permitted to sell or transfer their stock during the lock-up period, or even that they, unlike Ramey, affirmatively signed the lock-up agreement, as Ramey contends in his opposition, [id. at 11]. Because the Complaint does not contain any well-pleaded facts about Beta Bionics' treatment about other shareholders, Ramey's theory that Beta Bionics breached this second provision likewise fails. Accordingly, the Court grants Beta Bionics' motion to dismiss Ramey's breach-of-contract claim.

B.     **Chapter 93A**

Ramey claims that Beta Bionics violated Mass. Gen. Laws ch. 93A because it "acted unfairly and deceptively toward Ramey primarily and substantially in Massachusetts by intentionally breaching a contract that specifies Massachusetts law . . . in order to gain a contract advantage to which it was not entitled." [Compl. ¶ 32]. Beta Bionics raises several challenges to this claim, arguing that Ramey has not sufficiently alleged that (1) the conduct at issue occurred primarily and substantially in Massachusetts; (2) the transaction at issue was a commercial transaction between parties engaged in trade or commerce; and (3) Beta Bionics' conduct amounts to more than a mere breach of contract. [ECF No. 10 at 8–13].

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. "Although Chapter 93A claims are often linked with and derivative of other statutory and common law claims for relief, it is settled law that Chapter 93A supplies an independent cause of action." Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334–35 (D. Mass. 2012), aff'd, 527 F. App'x 20 (1st Cir. 2013). That said, a claim that is premised on allegations of a mere breach of contract "falls well short of the Chapter 93A liability threshold." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 590 (1st Cir. 2007). Instead, for a breach of contract to qualify as a violation of Chapter 93A, the defendant must "knowingly violat[e] its contractual agreements in order to secure an unwarranted benefit for themself." edv & cad group v. Scopic Software LLC, 771 F. Supp. 3d 33, 54 (D. Mass. 2025); see also Secure Our City, Inc. v. ECI Sys., LLC, 594 F. Supp. 3d 96, 105 (D. Mass. 2022) ("[T]he party alleging a Chapter 93A violation must demonstrate 'the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it

11

the rancid element of unfairness.'" (quoting Ahern v. Scholz, 85 F.3d 774, 799 (1st Cir. 1996))); Wagner v. Fed. Home Loan Mortg. Corp., 494 F. Supp. 3d 80, 87 (D. Mass. 2020) ("In order to transform a breach of contract into a Chapter 93A claim, 'the breach must be both knowing and intended to secure "unbargained-for benefits" to the detriment of the other party.'" (quoting Crosby Legacy Co., LLC v. TechnipFMC PLC, No. 18-cv-10814, 2019 WL 5588993, at *13 (D. Mass. Sept. 13, 2019))).

Moreover, "if a Chapter 93A claim is 'derivative of' other claims which fail as a matter of law, the Chapter 93A claim 'must also fail.'" Gattineri v. Wynn MA, LLC, 93 F.4th 505, 511 (1st Cir. 2024) (quoting Park Drive Towing, Inc. v. City of Revere, 809 N.E.2d 1045, 1050–51 (Mass. 2004)). However, "if separate arguments support a Chapter 93A claim, . . . it may survive as an independent cause of action." Mack v. Cultural Care Inc., No. 19-cv-11530, 2020 WL 4673522, at *7 (D. Mass. Aug. 12, 2020).

Here, as discussed above, the Complaint does not plausibly allege a breach of contract, which defeats any derivative claim by Ramey that Beta Bionics "breached in order to gain a contract advantage to which it was not entitled." [Compl. ¶ 32]; see also Gattineri, 93 F.4th at 511. Even if Ramey's breach-of-contract claim were to survive dismissal, the Complaint does not plausibly allege the kind of extortionate breach of contract that could give rise to liability under Chapter 93A. Ramey alleges that Beta Bionics "generated and abided by its restriction myth" in order "to protect the enterprise value of the company." [Compl. ¶ 23]. Even taken at face value, however, it is not clear that this alleged conduct secured "unbargained-for benefits" for Beta Bionics at Ramey's expense. Wagner, 494 F. Supp. 3d at 87 (quoting Crosby Legacy Co., 2019 WL 5588993, at *13). In fact, by protecting the company's enterprise value, Beta Bionics a fortiori also protected the value of the stock held by its shareholders, including Ramey.

Ramey's allegations that Beta Bionics acted purely for its own benefit (and to Ramey's detriment) appear to be conclusory and entirely speculative and could not transform even a viable breach-of-contract claim into a claim under Chapter 93A.  Thus, the Court need not reach Beta Bionics' other arguments and grants its motion to dismiss Ramey's Chapter 93A claim.

## IV.	CONCLUSION

For the foregoing reasons, Beta Bionics' motion dismiss, [ECF No. 9], is **GRANTED** without prejudice and with leave to amend.  Any amended complaint shall be filed within fourteen days of this order.

**SO ORDERED.**

November 26, 2025                                                        */s/ Allison D. Burroughs*
                                                                                            ALLISON D. BURROUGHS
                                                                                            U.S. DISTRICT JUDGE