**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| KIRK RAMEY, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Civil Action No. 1:25-cv-11904-ADB |
| v. ) | |
| ) | **LEAVE TO AMEND PERMITTED** |
| BETA BIONICS, INC. ) | **(ECF NO. 32, NOVEMBER 26, 2025)** |
| ) | |
| *Defendant*. ) | |
| ) | |

**FIRST AMENDED COMPLAINT**

Pursuant to this Court's Memorandum and Order (dated November 26, 2025), Plaintiff Kirk Ramey ("Plaintiff" or "Ramey"), by and through his attorneys, brings this action against Beta Bionics, Inc. ("Defendant" or "Beta") for breach of contract. For his First Amended Complaint, Plaintiff states as follows:

**PARTIES**

1. Ramey is an individual residing at 2701 NE 4th Street, Pompano Beach, Florida 33062.

2. Upon information and belief, Beta is a corporation organized under the laws of the State of Delaware.

3. On or about February 28, 2025, Beta filed its Annual Report for its fiscal year ending December 31, 2024 with the Office of the Massachusetts Secretary of the Commonwealth. As part of that filing, Beta listed its principal address as 300 Baker Avenue, Suite 301, Concord, Massachusetts 01742. On information and belief, Beta continues to maintain an office at this address.

1

4.      A few months later, on or about August 8, 2025, Beta made a corporate filing with the Massachusetts Secretary of the Commonwealth indicating that its principal office was actually located at 11 Hughes, Irvine, California 92618.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Beta and venue is proper under 28 U.S.C. § 1391(b) because, upon information and belief, Beta regularly conducts substantial business within the District of Massachusetts.  Further, a substantial part of the events giving rise to this action occurred here.

## FACTS

7.      In 2018, Ramey commenced an action against Boston University ("BU"), Beta, and others alleging that he had been promised a certain equity stake in Beta, a company established to commercialize a bionic pancreas Ramey helped develop (the "Project").

8.      Ramey is one of the named inventors on certain patents used in the Project and a coinventor on other patents and patent applications prosecuted by BU relating to the Project (the "BU Patents").

9.      The Complaint in the 2018 action was styled *Ramey v. Trustees of Boston University et al.*, Civ. A. No. 1884CV03240-BLS1 (the "Underlying Litigation").

10.      The Underlying Litigation was settled on April 2, 2024.

11.      Section 5 of the Settlement Agreement states:

*Stock.* Effective within the later of twenty-one days after (a) filing of the stipulation of dismissal provided for in Paragraph 1 or (b) Ramey provides to Beta Bionics

2

180032903.2

information necessary to effectuate the transaction contemplated in this section, namely his full legal name, his home and mailing address, and his social security number, Damiano shall issue One Hundred Thousand (100,000) shares of duly and validly issued Class B Common Stock of Beta Bionics to Ramey ("Settlement Stock Transfer"). The transfer shall be made by delivering to Ramey's counsel confirmation from Beta Bionics of the issuance of such shares in the name of Kirk D. Ramey. *Beta Bionics and Damiano represent and warrant that there are no adverse claims to the shares that will be transferred to Ramey, and Damiano and Beta Bionics agree that Ramey shall have the status of a purchaser for value and that he will acquire the shares free of any adverse claim.* Beta Bionics shall promptly register the transfer of shares to Mr. Ramey's *shares shall have the same rights and restrictions as all other Class B Common Stock and shall be treated identically with all other Class B Common stock for all purposes.* Within fourteen days after the Settlement Stock Transfer, Beta Bionics shall deliver a digital stock certificate to Ramey evidencing the shares. Ramey shall be treated as the owner of the shares for all purposes, including voting and dividends, as of the date of the Settlement Stock Transfer. (Emphasis added).

12.    The clear import of this provision is that Ramey would be issued stock with precisely the same rights as all other members of his stockholder class. Beta's articles of organization impose no transfer restrictions on any of the common stockholders. Specifically, Article V of Beta's Delaware articles of organization state that there will be *no restrictions* on the transfer Class B Common stock. Accordingly, there were no transfer restrictions on the stock issued to Ramey.

13.    Damiano thereafter transferred his Beta stock to Ramey. Consistent with Article V, there are no transfer restrictions stated on the stock certificate.

14.    Ramey was anxious to sell his Beta stock as quickly as possible given his skepticism about Beta's likely long-term success. Discussions concerning his right and ability to do so reach back to negotiations that informed the Settlement Agreement.

15.    On December 9, 2024, Ramey wrote to Beta informing the company of his intention to sell his Beta stock as soon as possible. He reiterated:

180032903.2

Pursuant to Article V of the Plan of Domestication…, there shall be no restrictions imposed upon the transfer of shares of stock of any class. Beta will not attempt to force, devalue, or prevent Ramey from selling his shares by special vote or otherwise. Beta Bionics will name a contact to facilitate sale of Ramey's shares, which he intends to sell as soon as possible.

16.     Beta responded to this letter on January 15, 2025 acknowledging that there were no restrictions on the sale of Ramey's stock, stating "[i]f Ramey would like to sell his shares, he will need to find a buyer on his own."  At that point in time, Beta was a closely held corporation.

17.     Shortly after this letter, Beta informed its stockholders that its bankers required each of them to agree to a six-month lockup.  On January 6, 2025, Beta wrote to stockholders stating:

> As you may be aware, Beta Bionics, Inc. ("Beta Bionics") is in the process of pursing an initial public offering ("IPO").
>
> Lock-up Agreement
> In connection with the IPO, the underwriters are requiring that all Beta Bionics securityholders (including optionholders and stockholders) sign a customary lock-up agreement, which is attached. From the date of the lock-up agreement until 180 days after the date of the pricing of the IPO, the lock-up agreement will prevent you from selling or transferring any Beta Bionics securities you hold, subject to certain exceptions. …
>
> **You will receive a DocuSign request from Kevin Meinert to sign the lock-up agreement. Please complete the DocuSign as soon as possible.**

18.     Ramey received the DocuSign request (hereinafter, the "Lockup Proposal") on January 6, 2025 and refused to agree to the unilateral amendment of his Settlement Agreement. He was therefore not bound by the Lockup Proposal and maintained the right to sell his stock.

19.     Two weeks after Beta requested the lockup, its stock began trading on the Nasdaq under the ticker "BBNX."  By then, Ramey had engaged a financial advisor to communicate his intention to liquidate to Beta's Investor Relations contact.

4

180032903.2

20.    Rather than facilitate the liquidation, Beta's senior employees intentionally stalled and ultimately refused to cooperate with Ramey's financial advisor. The stock price then quickly declined, eroding the value of equity Ramey should have already liquidated.

21.    Beta knew by the time it went public that Ramey was not bound by the Lockup Proposal. To preclude his sale nevertheless, Beta stymied the sale by failing to inform its transfer agent of Ramey's equity and refusing to correct that error immediately.

22.    On February 11, 2025, Beta's investors received an email from stating "the Company recently completed an IPO of its Common Stock on January 31, 2025 [and] [t]he Company's share records have been provided to our new transfer agent, Computershare." This was an intentional misrepresentation. It is now apparent that Beta deliberately failed to include Ramey's interests when transferring its share records to Computershare.

23.    Beta confirmed Computershare had no record of Ramey's stock in a February 14, 2025 e-mail. Because Computershare had no record of Ramey's stock, it could not be sold. Beta was obliged to fix that issue immediately, understanding of course that Ramey could not sell his stock until it was. It intentionally failed to do so.

24.    In an attempt to resolve this issue, a week later, on February 17, 2025, Ramey demanded that Beta either "[h]alt the transfer [of Ramey's stock] from Shareworks to Computershare" or "Expedite Kirk's account access to Computershare." After agreeing to investigate these options, three days later Beta abandoned the pretext that it was trying to be helpful and chose another route.

25.    On February 21, 2025, in response to Ramey's February 17 demand, Beta stated for the first time that "Kirk's shares are locked up for 180 days post-IPO due to the market standoff provision tied to the shares received by Ramey from Damiano."

26.     Beta contends that because Damiano agreed to a lockup (which is typical for C-level officers) in effect Ramey did as well.  More technically, Beta argued that the sale restrictions attach to the stock, whosoever owns it.  This position is fundamentally inconsistent with Ramey's rights under the Settlement Agreement and the articles of organization and further establishes Beta's bad faith.

27.     When Ramey acquired Damiano's stock, Beta, pursuant to the Settlement Agreement, was obliged to treat that stock "identically with all other Class B Common stock for all purposes."  Upon information and belief, Defendant failed to do so.

28.     In particular, on information and belief, Defendant treated Plaintiff differently from other shareholders because Defendant, among other things, imposed restrictions on Plaintiff's transferring or sale of stock without his agreement, while with regard to other shareholders, Defendant did receive their agreement to such restrictions.  This disparate treatment is unlawful and constitutes a breach of contract.

29.     Indeed, the Settlement Agreement requires Beta to "promptly register the transfer of shares to Ramey's shares [which] shall have the same rights and restrictions as all other Class B Common Stock and shall be treated identically with all other Class B Common stock for all purposes."  Article V of Beta's Delaware articles of organization specifically precludes transfer restrictions.  Beta therefore recognized that transfer restrictions could not be imposed but rather had to be voluntarily assumed.  Beta's February 11 proposal to stockholders implicitly acknowledges this fact.  Hence, the only option Beta had to restricting Ramey's rights to liquidate was to get his agreement.  It failed to do so.  Beta therefore contrived a new excuse to prevent liquidation – a fantom restriction that appears nowhere on the stock certificate, and which violates the obligations imposed under the Settlement Agreement.

180032903.2

30.      Beta's stock closed at $23.81 on January 31, 2025.  In June 2025, when Plaintiff initiated the instant lawsuit against Defendant in Suffolk County (Massachusetts) Superior Court, the stock traded at approximately $11.00.

31.      On February 28, 2025, Ramey sent a demand letter to Defendant.  Beta responded, accusing Ramey of conspiracy theories and declining the demand for compensation.  Ramey replied to Beta requesting evidence of its contention that Ramey was bound by the lockup provision.  Beta declined that request as well.

32.      Ramey's inability to sell his stock at the time that he wanted, and before Beta went public, caused him to lose a potential profit.

## COUNT I

33.      Ramey incorporates by reference the allegations of this First Amended Complaint as if restated herein.

34.      Ramey and Beta are parties to the Settlement Agreement.

35.      Ramey fully performed his obligations to Beta under the Settlement Agreement.

36.      Beta breached the Settlement Agreement as alleged *passim*.

37.      Ramey has been damaged by Beta's breach of contract in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kirk Ramey respectfully requests that this Court:

A.  Enter judgement in his favor on Count I of the First Amended Complaint;

B.  Award damages in an amount to be determined at trial, including compensatory and consequential damages;

C.  Award attorneys' fees, costs, and expenses as allowed by law; and

180032903.2

D.  Allow such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

**KIRK RAMEY**

By his counsel,

Dated: December 10, 2025

*/s/ Ari N. Stern*
Kevin T. Peters (BBO No. 550522)
Ari N. Stern (BBO No. 672442)
Brian J. Mahoney (BBO No. 707442)
Fox Rothschild LLP
33 Arch Street
Suite 3110
Boston, MA 02110
(617) 848-4017 - direct
(617) 848-4001 - fax
kpeters@foxrothschild.com
astern@foxrothschild.com
bmahoney@foxrothschild.com

180032903.2

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. I further certify that paper copies will be sent to those indicated as non-registered participants on the date below.

Dated: December 10, 2025                    */s/ Ari N. Stern*
                                            Ari N. Stern

180032903.2